# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>    vs.<br><br>WORLD TREE FINANCIAL, LLC, WESLEY KYLE PERKINS, and PRISCILLA GILMORE PERKINS,<br><br>        Defendants. | Case No. 18-cv-1229<br><br>JUDGE<br><br><br>MAGISTRATE JUDGE<br><br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## <u>SUMMARY OF THE ACTION</u>

1.　　This case is about a "cherry-picking" scheme carried out by an investment adviser and its owner.  Investment advisers often trade stocks and other securities for their clients on a daily basis, and "cherry-picking" happens when the adviser gives himself or his favored clients the winning trades for that day, and allocates the losing trades to other clients (the "disfavored" clients).  That is what defendant World Tree Financial LLC ("World Tree"), and one of its owners, defendant Wesley Kyle Perkins ("Perkins"), did.  They allocated "cherry-picked" winning trades to Perkins' accounts and to accounts held by some clients, while allocating losing trades to the accounts held by a disfavored client.  In doing so, they breached the fiduciary duties they owed their clients – Perkins took profits for himself and others, while at the same time causing substantial losses for the disfavored client.  Through this scheme, World Tree and Perkins misled the clients

who received the better trades into thinking World Tree and Perkins were better at managing their money than they really were.

2.     Perkins was World Tree's chief executive officer and chief investment officer, and was responsible for all of the firm's trading.  In those roles, he was able to disproportionately allocate profitable securities trades to accounts that he and defendant Priscilla Gilmore Perkins ("Gilmore") owned and controlled, and to other accounts.  Gilmore is Perkins' wife and World Tree's chief compliance officer.  At the same time, Perkins saddled two disfavored accounts, held by one client, with a disproportionate share of the firm's unprofitable trades.  The brokerage firm handling the trading for World Tree terminated its relationship with World Tree because it suspected the firm was engaging in cherry-picking.

3.     The defendants also misrepresented how World Tree was trading securities for its clients.  The firm's brochures and other disclosures claimed the trades were being fairly and equitably allocated among the client accounts.  The firm also claimed that Perkins and Gilmore were not trading in the same securities as World Tree's clients.  These claims were false —Perkins was cherry-picking trades, and he and Gilmore were trading in the same securities as their clients.

4.     By engaging in this cherry-picking scheme, and through their misrepresentations to their advisory clients, defendants World Tree and Perkins violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(a) and (c) thereunder;  Section 17(a)(1) of the Securities Act  of 1933 ("Securities Act"); and Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act").  Also, defendants World Tree, Perkins and Gilmore violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and Section 17(a)(2) of the Securities Act; and defendant Gilmore aided and abetted defendant World Tree's violations of the Advisers Act.  The SEC seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties against all three defendants.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209 (e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(3)(1) & 90b-14.

6.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

7.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because defendants Perkins and Gilmore reside in this judicial district, and defendant World Tree has its principal place of business in this judicial district.

## DEFENDANTS

8.      Defendant World Tree Financial, LLC is a Louisiana corporation with its principal place of business in Lafayette, Louisiana.  World Tree was an SEC-registered investment adviser until June 15, 2012, when it withdrew its SEC registration.  World Tree is currently registered as an investment adviser with the State of Louisiana.

9.      As of March 2018, World Tree had assets under management of over $54 million and 161 advisory clients, all of whom are individuals.

10.      Defendant Wesley Kyle Perkins is a resident of Lafayette, Louisiana.

He co-founded World Tree in 2009, and has been the firm's 60% owner, chief executive officer, and chief investment officer since World Tree's inception.  Perkins holds Series 6, 7, and 66 securities licenses.  Perkins married co-defendant Priscilla Gilmore Perkins in 2017.

11.     Defendant Priscilla Gilmore Perkins is a resident of Lafayette, Louisiana.  After co-founding World Tree with Perkins in 2009, Gilmore has been the firm's 40% owner, chief financial officer, chief compliance officer, and chief operating officer.  Gilmore holds Series 6, 7 and 66 securities licenses.

<u>FACTS</u>

**A.     World Tree's Formation and Operation**

12.     In 2009, Perkins and Gilmore left a subsidiary of a global financial services firm, where they had both worked as financial advisers, and co-founded World Tree.

13.     At all relevant times, Perkins has owned 60% of World Tree and Gilmore has owned the remaining 40% of the firm.

14.     World Tree's advisory clients are individual retail investors.

15.     The majority of World Tree's advisory clients are not high net worth individuals.

16.     For its investment advice, World Tree charges clients an advisory fee that ranges between 0.5% to 1.5% of the client's assets under management.

17.     From March 2011 through September 2015, World Tree managed between approximately $40 million and $70 million in client assets.

18.     World Tree assigned each of its clients one of five "investment models" based on the size of the client's account.

19.     Most of World Tree's clients bought from among the same group of individual securities, and held between two and ten different stocks in their respective accounts at one time, depending on the size of their account.

20.     Approximately 93% of World Tree's clients' investments involved the

same securities between March 2011 and September 2015.

21.     Notwithstanding World Tree's five "investment models," it utilized the same basic trading strategy across the majority of its client accounts.

22.     At all relevant times, Perkins and Gilmore have jointly controlled World Tree.

23.     As World Tree's chief investment officer, Perkins was solely responsible for managing all the securities trading, including allocating trades placed through the firm's omnibus account to clients.

24.     As World Tree's chief compliance officer, chief financial officer and chief operating officer, Gilmore ran World Tree's back office operations and supervised all aspects of the firm's compliance program.

**B.     Perkins' and World Tree's Fraudulent Cherry-Picking Scheme**

     **1.     Trading in Client Accounts**

25.     World Tree manages all of its clients' assets on a discretionary basis, meaning it has authorization to trade securities on behalf of its clients.

26.     Perkins was the only person at World Tree with the authority to make trades and determine allocations.

27.     From December 2009 to October 2015, World Tree traded through the brokerage platform of a registered broker-dealer ("Broker").  This Broker also acted as the custodian for World Tree's client accounts, meaning that a third-party held the securities on the clients' behalf.

28.     World Tree generally traded for its clients through an omnibus trading account held at the Broker and later allocated the purchases to its individual clients' accounts, generally after the market closed.

29.     In general, an omnibus trading account allows an investment adviser to buy and sell securities on behalf of multiple clients simultaneously, without identifying to the broker in advance the specific accounts for which a trade is intended.

30.    As an example, if an adviser separately purchases the same security for several clients on the same day, the adviser might obtain different prices on each transaction as a result of normal market fluctuation.  Rather than placing individual orders in each client account, the adviser can place an aggregated order, or "block trade," in the omnibus account and subsequently allocate the trade among multiple accounts using an average price.  When used properly, an adviser will fairly and equitably allocate the block trade among client accounts, ensuring that no account receives preferential treatment over another.

### 2.    The Cherry-Picking

31.    From at least March 2011 through September 2015, when World Tree traded through the Broker's platform, World Tree and Perkins misused the omnibus account to engage in a fraudulent scheme to defraud clients by cherry-picking.

32.    In fact, in April 2015, the Broker internally determined, based on a sampling analysis, that when trading in the same security, accounts held by World Tree, Perkins and Gilmore performed substantially better than their clients' accounts.

33.    The Broker then requested that World Tree provide materials showing how the firm was allocating trades to client accounts and World Tree and its principals' accounts.  Because World Tree did not produce the requested materials, the Broker terminated its relationship with World Tree based on its suspicions of cherry-picking in September 2015.

34.    From March 2011 to September 2015, World Tree traded equities for about 277 client accounts and accounts held by Perkins, Gilmore and/or entities they owned or controlled.

35.    During this period, World Tree and Perkins allocated favorable trades to nine accounts held by Perkins, Gilmore and/or entities they owned or controlled, and to a lesser degree, the World Tree client accounts (collectively, the "Favored Accounts") – except, however, for two client accounts that did not receive an equitable allocation of favorable trades.

36.     At the same time, World Tree and Perkins allocated unfavorable trades to those two remaining client accounts (the "Disfavored Client Accounts"), which were owned by one client, his wife, and the client's business entity (the "Disfavored Client").

37.     Specifically, from March 2011 to September 2015, Perkins allocated:  (i) a disproportionately high number of profitable trades to the nine favored Perkins accounts; (ii) a disproportionately high number of the most unprofitable trades to the Disfavored Client Accounts; (iii) a disproportionately low number of the most unprofitable trades to the Perkins accounts; and (iv) a disproportionately low number of the profitable trades to the Disfavored Client Accounts.

38.     The Disfavored Client Accounts were World Tree's largest accounts between 2011 and 2015, totaling up to $20 million in assets at various points in time.

39.     World Tree's cherry-picking was enabled by the fact that the Disfavored Client Accounts were large enough to absorb incremental, though steady, trading losses without arousing client suspicion that the losses were due to fraud.

40.     Perkins executed the cherry-picking scheme by trading in the firm's omnibus account and then delaying allocation of trades to a specific account until he had an opportunity to observe the security's intra-day performance.

41.     Typically, after purchasing a block of securities through World Tree's omnibus trading account, Perkins delayed allocating the purchase until after the market closed.

42.     If the relevant security's price closed higher, Perkins generally allocated the trade to the Favored Accounts, thereby receiving an unrealized gain.

43.     Conversely, when the security's price went down over the course of the day, Perkins generally allocated the purchase to the Disfavored Accounts, leaving those accounts with unrealized first-day losses.

44.     In some instances, Perkins purchased and sold the securities on the same day, thus locking in a realized gain or loss, and then disproportionately allocated

favorable trades to the Favored Accounts, and unfavorable trades to the Disfavored Accounts.

45.    Perkins also cherry-picked when World Tree bought and sold securities around corporate earnings announcements.

46.    To illustrate, from March 2011 through September 2015, about 17% of World Tree's trade allocations occurred on the same day that the companies whose securities were being allocated had issued, after market close, earnings announcements.

47.    On those days, Perkins often waited until after the release of a company's post-close earnings report before allocating trades in that company's securities.

48.    By delaying allocations, Perkins could take into account after-hours price movements relating to the earnings announcement.

49.    On repeated instances, when an earnings announcement had a negative post-market close impact on the price of the company's securities, Perkins allocated the entire block of unprofitable trades to the Disfavored Client Accounts, even though the Disfavored Client Accounts and many other client accounts who did not receive any of the unprofitable trades had been assigned the same investment model (called the "Large Cap" strategy) by World Tree and Perkins.

50.    The cherry-picking benefitted Perkins and Gilmore because Perkins cherry-picked the favorable trades for the accounts they held and controlled.

51.    In addition, the cherry-picking not only harmed the Disfavored Client, whose two accounts received the poor trades, but also made it appear to the other clients as if World Tree and Perkins were better at trading securities than they really were.

52.    From March 2011 through September 2015, Perkins allocated about 1,865 trades to the nine favored accounts held by the Perkins, Gilmore or their businesses.  Those trades earned a positive return of about 2.2%  – as measured by

actual returns in the case of day trades, and for other trades, the first-day returns showing the loss or gain between trade price and the closing share price, and where Perkins and World Tree traded around earnings announcements, the opening price on the following trading day – on about $16.1 million in notional value invested.

53.     During that same period, Perkins allocated about 22,220 trades to client accounts that were not the two Disfavored Client Accounts.  Those trades earned a positive return of about 1.0% during that time, as measured by actual returns in the case of day trades, and for other trades, the first-day returns showing the loss or gain between trade price and the closing share price, and for trades around earnings announcements, the opening price on the following trading day.

54.     In contrast, during that same period, the trades allocated to the Disfavored Client Accounts had negative returns.  Perkins allocated about 2,239 trades to these accounts during this time.  Those trades earned a negative return of about -1.05% on the approximately $424 million in notional value invested, as measured by actual returns in the case of day trades, and for other trades, the first-day returns showing the loss or gain between trade price and the closing share price, and for trades around earnings announcements, the opening price on the following trading day.  These trades resulted in first day losses and realized (in the case of a few day trades) losses of approximately $4.46 million.

55.     From March 2011 through September 2015, trading in all accounts generated an average return of negative return of about -0.23% on an approximately $695 million in notional value invested, as measured by actual returns in the case of day trades, and for other trades, the first-day returns showing the loss or gain between trade price and the closing share price, and for trades around earnings announcements, the opening price on the following trading day.

56.     According to a statistical analysis of these different returns, there is a less than 1 in a million chance that the disparate returns between the Favored Principal Accounts and Disfavored Accounts – an approximate difference of about

3.25% – are the product of mere random chance.

57.     According to a statistical analysis of these different returns, there is a less than 1 in a million chance that the disparate returns between the Disfavored Accounts and the other client accounts – an approximate difference of about 2.0% – are the product of mere random chance.

58.     In addition, during this same period from March 2011 to September 2015, Perkins allocated 48 of World Tree's 50 worst performing trades (as measured by first-day returns) to the Disfavored Client Accounts.  Those accounts, in turn, sustained about 92% of the losses associated with those 50 worst-performing trades.

59.     Similarly, Perkins allowed the Favored Accounts to participate in all of World Tree's 50 best performing trades (as measured by first-day returns) during that same period March 2011 to September 2015.  In contrast, Perkins allocated only six of those trades to the Disfavored Client Accounts during that time.

60.     As one example, in or about February 2014, Perkins allocated a poor-performing trade in a social media company to one of the two Disfavored Client Accounts.  The trade was allocated to the Disfavored Client Account as follows:

(a)     At 12:28 p.m. on February 5, 2014, Perkins, on behalf of World Tree, purchased 5,000 shares of the social media company in the omnibus account at $66.39 per share.

(b)     At 4:29 p.m., in a press release after the market closed, the social media company announced lower than expected financial results.

(c)     Shortly thereafter at 5:40 p.m., Perkins allocated all of these shares to the Disfavored Client Account at $66.39 per share.

(d)     The Disfavored Client Account was invested in the Large Cap strategy.

(e)     No shares were allocated to any other clients who were also invested in the Large Cap strategy.

(f)     The next day, the stock price for the social media company

opened at $50.61, a 24% decrease from the allocation price from the previous day.

61.    As another example, in or about July 2014, Perkins allocated a positively performing trade in the same social media company to the Favored Accounts:

(a)    At 3:48 p.m. on July 29, 2014, Perkins, on behalf of World Tree, purchased 3,000 shares of the social media company in the omnibus account at $38.569 per share.

(b)    At 4:15 p.m., in a press release after the market closed, the social media company announced higher than expected financial results.

(c)    Shortly thereafter, at 6:15 p.m., Perkins allocated the purchased shares at $38.569 per share to approximately 23 Favored Accounts, including the Favored Principal Accounts.

(d)    The next day, the social media company opened at $47.01, a 22% increase from the allocation price.

(e)    None of these shares were allocated to the Disfavored Client Accounts.

62.    It would have been important to World Tree's advisory clients' decisions on whether to place their assets under World Tree's management to know that trades were not being allocated fairly and equitably.

## C.    World Tree, Gilmore and Perkins Made False and Misleading Statements to Clients in the Firm's Brochures

63.    Between March 2011 and February 2015, World Tree made false and misleading statements in its Forms ADV, Part 2A.

64.    A Form ADV is a document that is filed with the SEC by investment advisers registered with the SEC.  The filing consists of two parts—Part 1 contains "check-the-box" information about the firm, and Part 2 is a brochure, in narrative form, which describes key information about the firm, including the types of services the firm provides.   An investment adviser's Form ADV must be updated annually, and made available to firm clients.

65.     While it was registered with the SEC, World Tree was required to deliver its Form ADV, Part 2A brochure to clients at the time it entered into an advisory contract with them, and to provide clients annually with World Tree's current brochure or a summary of any material changes to its existing brochure.

66.     While it was registered with the SEC, World Tree's Forms ADV, Part 2A were available online through the SEC's website.

67.     Once World Tree became a Louisiana state-registered investment adviser in June 2012, it filed its Forms ADV annually with the Investment Adviser Registration Depository; those filings were publicly available on the internet.

68.     Since founding the firm, Perkins and Gilmore each personally provided World Tree's Form ADV brochure to their advisory clients on regular occasions.

69.     Before providing them to World Tree's clients, Gilmore and Perkins both reviewed drafts of the Forms ADV, made changes when necessary, and authorized the final version for filing and distribution to World Tree's clients.

70.     Either Perkins or Gilmore signed every World Tree Form ADV from 2011 to 2015.  Each had ultimate control and authority over the contents of the form.

71.     World Tree's Forms ADV filed on March 15, 2011, February 7, 2012, June 5, 2012, March 25, 2013, March 18, 2014, February 9, 2015, August 7, 2015, and September 29, 2015 stated that: (i) "World Tree allocates investment opportunities among its clients on a fair and equitable basis"; (ii) "World Tree may … combine or 'batch' such orders … to allocate equitably among World Tree's clients"; and (iii) "To the extent that World Tree determines to aggregate client orders … World Tree shall generally do so in accordance with applicable rules promulgated under the Advisers Act and non-action guidance provided by the staff of the U.S. Securities and Exchange Commission."

72.     Given the cherry-picking scheme alleged above, each of these statements was false.  By cherry-picking winning trades to the Favored Accounts and losing trades to the Disfavored Client Accounts, World Tree did not allocate trades fairly or

equitably, and did not do so in accordance with the Advisers Act or guidance provided by the SEC.

73.    It would have been important to World Tree's advisory clients to know that, contrary to the representations made to clients, World Tree was not allocating trades fairly or equitably, or in a way that was consistent with the law.

74.    World Tree's Forms ADV filed on March 15, 2011, February 7, 2012, June 5, 2012, March 25, 2013, March 18, 2014, and February 9, 2015 also stated that: (i) "none of World Tree's Access Persons [Perkins and Gilmore] may effect for themselves or for their immediate family (i.e., spouse, minor children, and adults living in the same household as the Access Person) any transactions in a security which is being actively purchased or sold, or is being considered for the purchase or sale, on behalf of World Tree's clients"; and (ii) "no Access Person may purchase or sell … any Securities … if the Access Person knows or reasonably should know that the Security, at the time of purchase or sale (i) is becoming considered for purchase or sale on behalf of any client Account, or (ii) is being actively purchased or sold on behalf of any Client Account."

75.    These representations were false as well.  Between March 2011 and September 2015, Perkins allocated approximately 1,801 securities to accounts under Perkins' and Gilmore's ownership and/or control, while Perkins was buying those same securities for other World Tree clients through the omnibus account.

76.    It would have been important to World Tree's advisory clients to know that, contrary to the representations made to clients, World Tree's principals' accounts were trading in the same securities as their clients' accounts, in prohibited transactions.

## D.    World Tree, Perkins and Gilmore Acted Unreasonably and With Fraudulent Intent

77.    Perkins knowingly or recklessly engaged in a fraudulent scheme to cherry-pick securities trades for the benefit of accounts held by his family and his

clients, to the detriment of the Disfavored Client.  He further acted unreasonably when carrying out the cherry-picking scheme.

78.     Perkins also knew, or was reckless in not knowing that World Tree's Forms ADV were false and misleading when they claimed that the trading of securities would be allocated fairly and equitably among client accounts.  He further acted unreasonably when making those misstatements to clients and circulating those false and misleading Forms ADV.

79.     Because he is a co-owner and principal of the firm, his scienter and negligence in carrying out the cherry-picking scheme and defrauding clients in the Forms ADV are imputed to World Tree about the allocation practices.

80.     World Tree maintained a compliance manual, and Perkins certified that he had read and understood the manual.  In addition, Perkins and Gilmore held annual compliance meetings.

81.     World Tree's compliance manual states that the firm "maintains strict compliance with all applicable laws, rules and regulations," and identifies trade allocation as an area of potential conflict of interest that required additional monitoring by the firm's chief compliance officer.

82.     Annual compliance audit reports, which Perkins reviewed and approved, stressed the importance of fair and equitable trade allocations and stated that "[i]t is the Firm's policy, when placing aggregated client orders of securities simultaneously for more than one client (block trades) to allocate orders in a fair and equitable manner."

83.     In addition, Perkins and Gilmore each knew, or was reckless in not knowing, that they were prohibited from trading in the same securities as clients in their personal accounts, and that World Tree and Perkins's violation of that prohibition rendered World Tree's Forms ADV false and misleading.  Perkins and Gilmore further acted unreasonably when they issued Forms ADV to clients that falsely claimed they were not engaging in prohibited personal securities transactions.

84.     Because Perkins and Gilmore are co-owners and principals of the firm, their scienter and negligence in defrauding clients in the Forms ADV about the prohibited securities transactions are imputed to World Tree.

85.     Perkins and Gilmore have each admitted that they were aware of the prohibition and that in retrospect, their trading in the same securities as their clients violated the prohibition.

86.     Perkins and Gilmore each signed an annual acknowledgment that they had read and understood the compliance manual that contained a Code of Ethics, which explicitly described the prohibition against trading in securities also under consideration for investment by clients.

87.     In addition, among Gilmore's daily responsibilities as World Tree's chief compliance officer, Gilmore was responsible for verifying that Perkins's trade allocations had been correctly carried out by the Broker.

88.     Gilmore would verify on the following day that trades from the day before had been allocated as Perkins directed.

89.     World Tree's compliance manual stated that the chief compliance officer, Gilmore, was responsible for determining whether trade allocations were fair and equitable.

90.     Gilmore failed to take any steps to determine whether trade allocations were fair and equitable.

**E.     World Tree's and Perkins' Role as Investment Advisers**

91.     During all relevant times, World Tree and Perkins acted as investment advisers.

92.     World Tree provided investment advice to clients in exchange for a percentage of assets under management.

93.     World Tree was an SEC-registered investment adviser through June 2012, and is currently a Louisiana state-registered investment adviser.

94.     Perkins made all of the investment decisions for the securities trading in

World Tree accounts.

95.     Perkins, as World Tree's 60% owner, chief executive officer and chief investment officer, was compensated for managing World Tree client accounts and directly benefitted from the advisory fees World Tree earned.

**F.     Tolling of the Statute of Limitations**

96.     Pursuant to tolling agreements between defendants and the SEC, the statute of limitations applicable to the SEC's claims against defendants World Tree, Perkins, and Gilmore was tolled and suspended for the period beginning on August 1, 2017 through September 30, 2018.

**<ins>FIRST CLAIM FOR RELIEF</ins>**

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Defendants World Tree and Perkins)**

97.     The SEC realleges and incorporates by reference paragraphs 1 through 96 above.

98.     As alleged above, defendants World Tree and Perkins engaged in a scheme to defraud clients, and engaged in acts, practices or courses of business that operated as a fraud upon clients, by cherry-picking favorable trades for the Favored Accounts and allocating poor trades to the Disfavored Client Account, which sustained substantial losses as a result.

99.     By engaging in the conduct described above, defendants World Tree and Perkins, and each of them, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

100.    Defendants World Tree and Perkins, with scienter, employed devices,

schemes and artifices to defraud; and engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the conduct described in detail above.

101.   By engaging in the conduct described above, defendants World Tree and Perkins violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against Defendants World Tree, Perkins and Gilmore)**

102.   The SEC realleges and incorporates by reference paragraphs 1 through 96 above.

103.   As alleged above, defendants World Tree, Perkins and Gilmore made untrue statements of material fact in World Tree's Forms ADV concerning their securities trading and trade allocations.  Specifically, World Tree and Perkins made false and misleading statements in the Forms ADV about the firm's trade allocation practices; World Tree, Perkins and Gilmore made false and misleading statements in the Forms ADV about whether or not Perkins and Gilmore traded in the same securities as their clients.

104.   By engaging in the conduct described above, defendants World Tree, Perkins and Gilmore, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

105.   By engaging in the conduct described above, defendants World Tree,

Perkins and Gilmore violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

**THIRD CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**

**Violations of Sections 17(a)(1) of the Securities Act**

**(against Defendants World Tree and Perkins)**

106.   The SEC realleges and incorporates by reference paragraphs 1 through 96 above.

107.   As alleged above, defendants World Tree and Perkins engaged in a scheme to defraud clients, and engaged in acts, practices or courses of business that operated as a fraud upon clients, by cherry-picking favorable trades for the Favored Accounts and allocating poor trades to the Disfavored Client Account, which sustained substantial losses as a result.

108.   By engaging in the conduct described above, defendants World Tree and Perkins, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly employed devices, schemes, or artifices to defraud.

109.   Defendants World Tree and Perkins, with scienter, employed devices, schemes and artifices to defraud.

110.   By engaging in the conduct described above, defendants World Tree and Perkins violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (against Defendants World Tree, Perkins and Gilmore)

111.   The SEC realleges and incorporates by reference paragraphs 1 through 96 above.

112.   As alleged above, defendants World Tree, Perkins and Gilmore obtained money by means of untrue statements of material fact in World Tree's Forms ADV concerning their securities trading and trade allocations.  Specifically, the Forms ADV contained false statements about the firm's trade allocation practices and about whether or not Perkins and Gilmore traded in the same securities as their clients.

113.   By engaging in the conduct described above, defendants World Tree, Perkins and Gilmore, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

114.   Defendants World Tree, Perkins and Gilmore, with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.   By engaging in the conduct described above, defendants World Tree, Perkins and Gilmore violated, and unless restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## FIFTH CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (against Defendants World Tree and Perkins)

116.   The SEC realleges and incorporates by reference paragraphs 1 through 96 above.

117.   As alleged above, defendants World Tree and Perkins each had an adviser-client relationship with, and therefore owed a fiduciary duty to, each of World Tree's clients.  World Tree and Perkins both breached their fiduciary duty by carrying out the cherry-picking scheme and by falsely representing in World Tree's Firm Brochures that the firm had equitably and fairly allocated transactions among its clients, and that World Tree's principals had not engaged in prohibited transactions. At all relevant times, defendant Perkins acted knowingly or recklessly when carrying out this fraud, and his state of mind is imputed to World Tree, which he controlled.

118.   By engaging in the conduct described above, defendants World Tree and Perkins, and each of them, directly or indirectly, by use of the mails or means of instrumentalities of interstate commerce:  (a) employed devices, schemes or artifices to defraud clients or prospective clients, and (b) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

119.   By engaging in the conduct described above, defendants World Tree and Perkins, and each of them, violated, and unless restrained and enjoined will continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (against Defendant Gilmore)

120.   The SEC realleges and incorporates by reference paragraphs 1 through 96 above.

121.   Gilmore knew or was reckless in not knowing that the representations in World Tree's Forms ADV concerning prohibited transactions were false.  She reviewed the ADVs; she signed acknowledgements that she had read World Tree's compliance manual; and she knew or was reckless in not knowing, as she verified trade allocations, that accounts under her and Perkins' ownership and control were trading in the same securities as World Tree's clients' accounts, in prohibited transactions.

122.   By engaging in the conduct described above, defendant World Tree and Perkins violated Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

123.   By engaging in the conduct described above, defendant Gilmore knowingly or recklessly provided substantial assistance to, and thereby aided and abetted World Tree and Perkins in its violations of Sections 206(1) and 206(2) of the Advisers Act.  At all relevant times, defendant Gilmore acted knowingly or recklessly in aiding and abetting World Tree's and Perkins' Advisers Act violations.

124.   By engaging in the conduct described above, defendant Gilmore aided and abetted, and unless restrained and enjoined, will continue to aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2), as prohibited by Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

## I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily, and permanently enjoining defendants World Tree and Perkins, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) & 80b-6(2)].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, temporarily, preliminarily, and permanently enjoining defendant Gilmore, and her agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and from aiding and abetting any violation of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§80b-6(1) & 80b-6(2)].

## IV.

Order Defendants World Tree and Perkins to jointly and severally disgorge all funds received from their illegal conduct; and order Defendants World Tree, Perkins and Gilmore to jointly and severally disgorge all funds received from their illegal conduct; together with prejudgment interest thereon.

## V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Respectfully submitted,

GARY Y. LEUNG
California Bar No. 302928
DAVID M. ROSEN
California Bar No. 150800
SECURITIES AND EXCHANGE
COMMISSION
444 S. Flower Street, 9th Flr.
Los Angeles, CA 90071
(323) 965-3213
(213) 443-1904 (facsimile)
leungg@sec.gov
rosend@sec.gov

COUNSEL FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION

DAVID C. JOSEPH
United States Attorney

COMPLAINT

23

By:  /s/ Karen J. King

KAREN J. KING (#23508)
U.S. ATTORNEY'S OFFICE
WESTERN DISTRICT OF LOUISIANA
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501-6832
(337) 262-6618
(337) 262-6693 (facsimile)
karen.king@usdoj.gov
*Local Counsel*


DATED:  September 18, 2018