UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

SECURITIES & EXCHANGE
COMMISSION

CIVIL ACTION NO.  6:18-CV-01229

VERSUS

JUDGE JUNEAU

WORLD TREE FINANCIAL L L C ET
AL

MAGISTRATE JUDGE WHITEHURST

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This litigation arises out of a civil action in which the Securities and Exchange Commission ("SEC") seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties against World Tree Financial, LLC ("World Tree"), Wesley Perkins, and Priscilla Perkins.

The SEC alleged:

1. that by engaging in a cherry-picking scheme, World Tree and Wesley Perkins violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") along with Rule 10b-5(a) and (c) thereunder; and Section 17(a)(1) of the Securities Act of 1933 ("Securities Act"),

2. that by making false and misleading statements about their allocation practices, World Tree and Wesley Perkins violated Section 10(b) of the Exchange Act along with Rule 10b-5(b) thereunder; and Section 17(a)(2) of the Securities Act,

3. that by making false and misleading statements about their trading practices, World Tree, Wesley Perkins, and Priscilla Perkins violated Section 10(b) of the Exchange along with Act Rule 10b-5(b) thereunder; and Section 17(a)(2) of the Securities Act, and

4. that through their misrepresentations to their advisory clients, World Tree and Wesley Perkins violated Sections 206(1) and (2) of the Investment Advisers Act of 1940 ("Advisers Act"), and that Priscilla Perkins aided and abetted World Tree and Wesley Perkins in violating the Advisers Act.

The Court, sitting without a jury, tried this case from November 2 – 5, 2020. Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

## I. FINDINGS OF FACT

1.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business at issue. The conduct at issue took place between July 2012 and July

2015. *Rec. Doc. 70, Stipulations of Fact ("Stip.") 51.*

2.      World Tree is a Louisiana corporation with its principal place of business in Lafayette, Louisiana. World Tree was an SEC-registered investment adviser until June 15, 2012, when it was required to withdraw its SEC registration due to a change in the registration provisions of the Advisers Act. World Tree was registered as an investment adviser with the State of Louisiana at the time this lawsuit was filed. *Rec. Doc. 70, Stip. 1 – 3.*

3.      Wesley Perkins is a resident of Lafayette, Louisiana and co-founded World Tree with Priscilla Perkins in 2009. At all relevant times, Wesley Perkins was the firm's 60% owner, chief executive officer, and chief investment officer. Wesley Perkins held Series 6, 7, and 66 securities licenses at the time this lawsuit was filed. Wesley and Priscilla Perkins married each other in 2017. *Rec. Doc. 70, Stip. 5 - 8.*

4.      Priscilla Gilmore Perkins is a resident of Lafayette, Louisiana. At all relevant times, Priscilla Perkins was the firm's 40% owner, chief financial officer, chief compliance officer, and chief operating officer. Priscilla Perkins held Series 6, 7, and 66 securities licenses at the time this lawsuit was filed. *Rec. Doc. 70, Stip. 9 – 11.*

5.      For its investment advice, World Tree charged clients an advisory fee that ranged between 0.5% to 1.5% of the client's assets under management. From March 2011 through September 2015, the assets under management at World Tree varied,

and at times were between approximately $40 million and $70 million. *Rec. Doc. 70, Stip. 14 – 15.*

6.    At all relevant times, Wesley and Priscilla Perkins jointly controlled World Tree. As World Tree's chief investment officer, Wesley Perkins was responsible for conducting trades on behalf of clients. As World Tree's chief compliance officer, chief financial officer, and chief operating officer, Priscilla Perkins supervised the firm's compliance program. *Rec. Doc. 70, Stip. 17 – 19.*

7.    World Tree and Wesley Perkins managed most of their clients' assets on a discretionary basis, meaning they had authorization to trade securities on behalf of most of their clients. From December 2009 to October 2015, World Tree traded securities through the brokerage platform of registered broker-dealer Charles Schwab ("Schwab"). Schwab also acted as the custodian for World Tree's client accounts, meaning that Schwab held the securities on the clients' behalf. *Rec. Doc. 70, Stip. 20 – 22, Moore trial testimony ("test."), Wesley Perkins test.*

8.    In order to conduct trading, Wesley Perkins used a block trade account (also referred to as a master account or omnibus account) registered to World Tree. A block trade account allows a broker to execute a single large trade in its own name for the benefit of its clients and then allocate portions of that trade to particular client accounts. These accounts typically generate clear benefits for both brokers and clients, as stated in World Tree's Compliance Manual: "Block trades may result in

lower commissions and better prices for clients than if the Firm placed multiple single orders. Block trades may also provide the Firm with operational efficiencies." *Plaintiff's Trial Exhibit ("Pl. Ex.") 14.*

9.      Though a common practice in the securities industry, the use of block trades carries some risk. Specifically, because client allocations occur after an initial larger trade, an unscrupulous broker could manipulate those allocations based on whether the asset(s) involved in the block trade increased or decreased in value in the period of time between the initial transaction and the allocations. Such manipulation is known in the industry colloquially as "cherry-picking." Aware of the risk of cherry-picking inherent in the use of block trades, trading firms and brokers typically adopt procedures to prevent it and monitoring practices to detect it. *Moore test., Niden test.*

10.     On paper, World Tree purported to adopt such procedures. World Tree's Compliance Manual specifically addressed cherry-picking, stating "[w]hen the Firm places block trades or must allocate limited investment opportunities among its clients, important issues arise concerning the equitable distribution of such securities" and assured its clients that its policy was to "allocate such orders and opportunities in a fair and equitable manner." The manual states (in pertinent part):

**<u>PROCEDURES</u>**

The Firm, in advance of placing a block trade will:

   …Ensure that each client will be treated fairly and will not favor any client over another; and

Ensure that the decision to aggregate a trade for a client is based on individual advice to that client.

Once the foregoing prerequisites have been performed, the Firm will either:

Designate on the trade order memorandum, the number of shares of the block trade to be allocated to each specific account prior to placing the order; or
Make a pro rata allocation of the shares to each account based upon size of the client's account.

Throughout the block trade, the Firm shall continue to:

Seek best execution on such trades;…

*Timing*

The Firm will use its best efforts to make allocations on the same day. However, under no circumstances will the Firm delay allocation so that it can allocate the more favorable prices received during the day to one account and the less favorable prices to another account.

*Review*

The Chief Investment Officer will review all allocations of trades and limited investment opportunities to ensure that the Firm's policies and procedures were followed and verify that no client account was systematically disadvantaged by the allocation.

## BOOKS AND RECORDS

In its books and records, the Firm will maintain all documents that relate to allocation of block trades and limited investment opportunities.
*Pl. Ex. 14 at 53-55.*

11.     Similarly, Schwab set up monitoring systems to detect cherry-picking. In

2015, Schwab's automatic system detected anomalous allocations from the World

Tree omnibus account. As a result, Schwab opened an investigation and assigned it

to Grant Moore ("Moore"), a senior advisor services compliance manager. *Moore test.*

12.    Moore began the investigation by reviewing Schwab's reports and World Tree's registration documents. Moore then called Wesley and Priscilla Perkins[1] to ask questions regarding their allocation process. The Perkinses told Moore that they reviewed each account daily to see how much cash was in the account and that the amount of cash available determined whether World Tree would allocate a trade to it. The Perkinses also told Moore that they did not keep documentation to show how they processed trades on a particular day. In response, Moore asked them to send any reports to verify that they were allocating their block trades fairly and equitably. Moore testified that he expect to receive something like a spreadsheet indicating client balances, data which he then could compare to Wesley Perkins's individual allocation decisions to determine whether his stated rationales for those decisions were true. *Moore test.*

13.    However, in response to Moore's inquiry, Priscilla Perkins sent an email with attachments containing only cryptic columns of numbers and letters, devoid of context or explanation. For Moore, the highly irregular submission only aroused further suspicion. He asked again for any documentation regarding the amount of cash in a client's account and how allocation decisions were made, and the Perkinses

---

[1] Wesley and Priscilla Perkins were not yet married.

insisted that no further documentation was available due to their practice of deleting the requested information every day after the allocation process was complete. Moore was wholly dissatisfied with their response, and Schwab sent World Tree a letter on September 15, 2015 terminating World Tree's ability to make block trades immediately and terminating World Tree as a client altogether on December 15, 2015. The Court finds that Mr. Moore was a credible witness and that his concerns regarding the Perkins' allocation practices and their response to his investigation were reasonable and well-founded. *Pl. Ex. 56, 87, Moore test.*

14.     The SEC opened a formal investigation of World Tree, Wesley Perkins, and Priscilla Perkins on November 22, 2016 and filed suit against them on September 18, 2018. As part of their investigation, the SEC hired Dr. Cathy Niden to assess economic evidence regarding whether Wesley Perkins and World Tree engaged in cherry-picking. Dr. Niden has a PhD in Finance and Economics from the University of Chicago, and the Court accepted her as an expert witness. The Court finds that she was a credible witness and concludes that her testimony was both thorough and compelling. *Rec. Doc. 70, Stip. 53, 55, Niden test., Pl. Ex. 88, 89.*

15.     To conduct her analysis, Dr. Niden relied on data produced by Schwab, which she supplemented with market quotation data from the New York Stock Exchange's Trade and Quote system ("TAQ data"). The SEC obtained this TAQ data from a commercial service commonly used in the securities industry, and the Court finds

that Dr. Niden's analysis reflected the use of sound methods and reliable information. *Niden test., Valerie Bell test. – Schwab Document Custodian.*

16.    In reviewing World Tree's allocation data, Dr. Niden divided the firm's individual client accounts into three categories: those owned directly by Wesley Perkins, Priscilla Perkins, or World Tree (termed "Favored-Perkins accounts"), those owned by all of the firm's other clients except for Matthew and Melanie LeBlanc and Delcambre Cellular (termed "Favored-Client accounts"), and the two accounts owned by the LeBlancs and Delcambre Cellular (termed "Disfavored accounts"). *Niden test.*

17.    Matthew LeBlanc and his wife Melanie LeBlanc became investment advisory clients of World Tree after meeting Wesley Perkins while he was a personal banker for Chase. Mr. LeBlanc owns a business named Delcambre Cellular, LLC, in whose name one of the relevant accounts was held. The LeBlancs and Delcambre Cellular were World Tree's largest clients and had between $10 and $20 million in assets under management at various points during the time period at issue. The Court finds that Mr. LeBlanc was a credible witness and credits his testimony that LeBlanc did not want to lose money with his World Tree investments, either for tax purposes or any other reason, and that he never directed, authorized, or expected Wesley Perkins to disproportionately allocate losses to his accounts. *LeBlanc test., Wesley Perkins test.*

18.    After collecting and analyzing the data regarding World Tree's most and least favorable trades, Dr. Niden found that Wesley Perkins consistently allocated the largest favorable trades—whether calculated by rate of return or dollar profits—to the Favored-Perkins and Favored-Client accounts. At the same time, Perkins consistently allocated the largest unfavorable trades to the Disfavored accounts. Based on those findings, Dr. Niden concluded "that the patterns [she] observed in the allocations strongly supported the SEC's allegations of cherry-picking." *Niden test.*

19.    Dr. Niden tested her conclusion by analyzing the data in a variety of ways. She examined Quarterly First-Day Returns, Master Account Order v. Allocation Times, Profitability of Allocations by Account Type and Day/Multi-Day Trades, Best 50 First-Day Returns, Worst 50 First-Day Returns, Apple Intra-Day Stock Price on January 27, 2014, Profitability of Allocations on Earnings Announcement Days, First Day Profit Summary, and First-Day Returns of Stocks with Greatest Dollar Amount Allocated. All of these measures consistently indicated that Wesley Perkins allocated an overwhelming proportion of positive trades to Favored-Perkins and Favored-Client accounts and an overwhelming proportion of negative trades to the Disfavored accounts. The Court credits Dr. Niden's testimony that such disparate results could not have happened by chance, nor could they reflect any plausible economic reasoning or legitimate investment strategy. Accordingly, the Court finds

that Dr. Niden's analysis is compelling proof of intentional cherry-picking, as there is simply no other plausible explanation for the patterns in the data. *Pl. Ex. 88, 89, 117, 120 – 133*, *Niden test.*

20.     Despite Wesley Perkins's attempting to provide a number of explanations, insisting all the while that he made all allocation decisions before the initial block trade, the Court finds that he was not a credible witness. His purported explanations appeared implausible or largely beside the point, and his demeanor appeared alternatively evasive or defensively argumentative. While the Court believed Wesley Perkins when he testified that he understood what cherry-picking was and that it was wrong, the Court did not believe him when he claimed that he did not engage in cherry-picking. *Perkins test.*

21.     Defendants' expert Dr. Charles Theriot offered some clarifications regarding Dr. Niden's data analysis and conclusions. The Court accepted him as an expert and finds him to be a credible witness. While Dr. Theriot rightly observed that the disproportionate size of the Disfavored accounts could explain *some* of the disproportionate results and that some of the losing trades allocated to the Disfavored accounts eventually made a profit, the Court finds that these observations do not speak to why the price of the same stocks tended to go always up on the days that they were purchased for the Favored-Perkins or Favored-Client accounts but tended to go always down on the days that they were purchased for the Disfavored accounts.

In short, Dr. Theriot's testimony did not alter the Court's conclusion that the only plausible explanation for the disproportional losses in the Disfavored accounts and gains in the Favored accounts is cherry-picking. *Theriot test.*

22.    Accordingly, the Court finds by a preponderance of the evidence that Wesley Perkins intentionally cherry-picked favorable trades for the Favored-Perkins and Favored-Client accounts, and intentionally allocated unfavorable trades to the Disfavored client accounts.

23.    Form ADV is a two-part document that investment advisors are required to file and/or update annually. Part 1 contains "check-the-box" information about the firm, and Part 2 is a brochure, in narrative form, which describes key information about the firm, including the types of services the firm provides. World Tree, through Wesley Perkins or Priscilla Perkins, delivered its Form ADV, Part 2A brochure to clients at the time it entered into an advisory contract with them, and made it available to clients annually. *Rec. Doc. 70, Stip. 25 – 30.*

24.    Before providing them to World Tree's clients, Wesley and Priscilla Perkins reviewed drafts of the Forms ADV and authorized the final versions for filing and distribution to World Tree's clients. Wesley Perkins and/or Priscilla Perkins signed every World Tree Form ADV from 2011 to 2015. Wesley and Priscilla Perkins had ultimate control and authority over the contents of the Forms ADV. *Rec. Doc. 70, Stip. 31 – 34.*

25.     Item 11 of World Tree's Forms ADV Part 2A, filed on March 15, 2011;

February 7, 2012; June 5, 2012; March 25, 2013; March 18, 2014; and, February 9,

2015 stated that:

> (i) "none of World Tree's Access Persons [Wesley and Priscilla Perkins] may effect for themselves or for their immediate family (i.e., spouse, minor children, and adults living in the same household as the Access Person) any transactions in a security which is being actively purchased or sold, or is being considered for the purchase or sale, on behalf of World Tree's clients," and
>
> (ii) "no Access Person may purchase or sell … any Securities … if the Access Person knows or reasonably should know that the Security, at the time of purchase or sale (i) is becoming considered for purchase or sale on behalf of any client Account, or (ii) is being actively purchased or sold on behalf of any Client Account."

Item 12 of World Tree's Forms ADV Part 2A, filed on March 15, 2011; February 7,

2012; June 5, 2012; March 25, 2013; March 18, 2014; February 9, 2015; and, August

7, 2015 stated that:

> To the extent that World Tree determines to aggregate client orders for the purchase or sale of securities, including securities in which World Tree's *Supervised Persons* may invest, World Tree shall generally do so in accordance with applicable rules promulgated under the Advisers Act and no action guidance provided by the staff of the U.S. Securities and Exchange Commission.
>
> *Rec. Doc. 70, Stip. 35, 36.*

26.     Wesley Perkins and Priscilla Perkins each signed an acknowledgment that

they had read and understood the World Tree Compliance Manual. The Compliance

Manual explicitly described the prohibition against trading in securities also under

consideration for investment by clients. In August 2015, World Tree amended Part

2A of its Form ADV to state that they could trade in the same securities as World Tree's clients using the omnibus account. Both Wesley Perkins and Priscilla Perkins testified before the SEC in 2017 that they were aware of the prohibition in the World Tree Compliance Manual and Forms ADV against trading the same securities that World Tree and Perkins were trading for clients. *Rec. Doc. 70, Stip. 37 – 41.*

27.    As discussed above, the data reviewed by Dr. Niden indicated that Wesley and Priscilla Perkins' own accounts (termed "Perkins-Favored") received allocations from block trades involving the same securities that they were trading for their clients. At trial, Wesley Perkins and Priscilla Perkins claimed that they had merely misunderstood the language of the Compliance Manual, but the Court does not find their testimony credible. Instead, the Court finds that Wesley Perkins and Priscilla Perkins were aware that they had told their clients that they would not trade in the same securities as their clients, and yet they did exactly that. *Wesley Perkins test., Priscilla Perkins test.*

28.    During all relevant times, World Tree and Wesley Perkins acted as investment advisers. World Tree provided investment advice to clients in exchange for a fee calculated as a percentage of assets under management. World Tree was an SEC-registered investment adviser through June 2012 and was a Louisiana state-registered investment adviser at the time this action was commenced. Wesley Perkins made the investment decisions for the securities trading in World Tree

accounts. Wesley Perkins was compensated from the advisory fees World Tree earned in the form of salary, bonuses, and benefits. *Rec. Doc. 70, Stip. 45 – 49.*

29.     Dr. Niden quantified a reasonable estimate of the economic harm that Perkins caused the LeBlancs through his fraudulent cherry-picking scheme, and she also estimated the benefit received by the Defendants. To make this estimation, Dr. Niden determined the overall first-day profits and first-day rates of return for all trades in the omnibus account, and then hypothetically apportioned them in a fair manner (pro rata) among the different account types. She then calculated the difference between what each group would have received in the hypothetical fair allocation and the actual performance of each group. The Court finds that Dr. Niden's method was a reasonable one for estimating the harm to the LeBlancs and the benefit to the Defendants from the cherry-picking scheme. *Niden test.*

30.     Dr. Niden's analysis also showed that the Defendants received excess first-day profits of $347,947. The Court finds that $347,947 is a reasonable estimate of the net benefit the Defendants received from the cherry-picking scheme. The Court finds that prejudgment interest, at the statutory rate for unpaid debts to the government, beginning as of the date the Complaint was filed through the time of trial is $36,335.98 on a $347,947 disgorgement amount. The SEC has represented that it intends to distribute any disgorgement that it collects from the Defendants to the LeBlancs. *Niden test.*, *Pl. Ex. 133, 150.*

## II. Conclusions of Law

Based on the foregoing facts, the Court reaches the following Conclusions of Law:

1.    The Court has jurisdiction over the claims asserted in this action pursuant to the following statutes:

  a. the Securities Exchange Act of 1934 ("Exchange Act"), Sections 21(d)1, 21(d)(3)(A), 21(e), and 27(a), *15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e), 78aa(a)*;

  b. the Securities Act of 1933 ("Securities Act"), Sections 20(b), 20(d)(1), and 22(a), *15 U.S.C. §§ 77t(b), 77t(d)(1), 77t(a)*;

  c. the Investment Advisers Act of 1940 ("Advisers Act"), Sections 209(d), 209(e)(1), and 214, *15 U.S.C. §§ 80b-9(d), 80b-9(e)(1), 80b-14(a)*.

2.    The Court has jurisdiction over the defendants in this action pursuant to Fed. R. of Civ. P. 4(k)1(A) and Louisiana Code of Civil Procedure Art. 6(A)(1).

3.    The Western District of Louisiana is a proper venue for this action pursuant to 28 U.S.C. § 1391(b).

4.    The conduct at issue in this action involved use of the means or instruments of communication in interstate commerce or use of the mails. *15 U.S.C. §§ 77q(a); 78j; 80b-6.*

<u>Cherry-Picking</u>

5.      The SEC alleged that defendants Wesley Perkins and World Tree engaged in a cherry-picking scheme that violated three statutes: Section 10(b) of the Exchange Act, and associated Rules 10b-5(a) and 10b-5(c), *15 U.S.C. § 78j(b); 17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)*; Section 17(a)(1) of the Securities Act, *15 U.S.C. § 77q(a)(1)*; and, Sections 206(1) and 206(2) of the Advisers Act, *15 U.S.C. §§ 80b-6(1), (2).*

6.      To establish a violation of Section 10(b) and/or Rule 10b-5 of the Exchange Act, the SEC must prove each of the following by a preponderance of the evidence:

> a. That a defendant, directly or indirectly, did any one or more of the following acts:
>
> > i.    Employed a device, scheme, or artifice to defraud; and/or
> >
> > ii.   Made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or
> >
> > iii.  Engaged in an act, practice, or course of business which operated as a fraud or deceit upon any person.
>
> b. That the defendant's conduct was in connection with the purchase or sale of a security.

c. That the defendant acted with scienter, meaning knowingly or with severe recklessness.

*See Aaron v. Sec. & Exch. Comm'n*, 446 U.S. 680, 695 (1980).

7.     Cherry-picking represents a device, scheme, or artifice to defraud, one that operates as a fraud upon any client to whom unfavorable trades are allocated or from whom favorable trades are withheld.

8.     Cherry-picking is in connection with the purchase or sale of a security because there is a nexus between the fraudulent trade allocation and the underlying securities transaction. *Cf. S.E.C. v. Zandford*, 535 U.S. 813, 825 (2002).

9.     By its very nature, cherry-picking cannot be the result of mere negligence or ordinary recklessness; rather, it necessarily involves knowing and intentional conduct. This was also confirmed by the testimony of Wesley Perkins.

10.     Even if the intentional act of cherry-picking could somehow fail to establish a defendant's knowing intent to deceive or defraud, the facts of this case provide strong evidence of scienter on the part of Wesley Perkins.

11.     The SEC has shown by a preponderance of the evidence that Wesley Perkins engaged in a cherry-picking scheme with scienter. Therefore, Wesley Perkins is liable for violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and judgment will be entered accordingly.

12.     As Wesley Perkins controlled World Tree as its officer, co-owner, and

founder, his scienter can and should be imputed to World Tree. *See Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365-66 (5th Cir. 2004) (holding that executive actions made pursuant to positions of authority were attributable to company).

13.   The SEC has shown by a preponderance of the evidence that World Tree engaged in a cherry-picking scheme with scienter. Therefore, World Tree is liable for violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and judgment will be entered accordingly.

14.   To establish a violation of Section 17(a)(1) of the Securities Act, the SEC must prove each of the following by a preponderance of the evidence:

> a.   That a defendant directly or indirectly employed a device, scheme, or artifice to defraud.
>
> b.   That the defendant's conduct was in the offer or sale of a security.
>
> c.   That the defendant acted knowingly or with severe recklessness.
>
> *See Steadman v. Sec. & Exch. Comm'n*, 603 F.2d 1126, 1131, 1133 (5th Cir. 1979).

15.   The elements required to establish a violation of Section 17(a)(1) of the Securities Act are largely identical to those required to establish the Section 10(b) violation discussed above; the primary difference between the two statutes is that Section 17(a)(1) applies only to conduct "in the offer or sale of a security," i.e., to

sales transactions only, while Section 10(b) applies more broadly to conduct "in connection with the purchase or sale of a security," i.e., to buyers and sellers alike. *Aaron*, 446 U.S. at 687. *See also Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1102 (2019) (noting that considerable overlap in securities laws does not suggest the provisions were intended to be mutually exclusive).

16.     Wesley Perkins's conduct was "in the offer or sale of a security" because he either personally directed sales transactions or solicited others to act to produce a sale while motivated in part by his own financial benefit. *Meadows v. Sec. & Exch. Comm'n*, 119 F.3d 1219, 1225-26 (5th Cir. 1997).

17.     As stated above, Wesley Perkins's conduct and scienter can and should be imputed to World Tree.

18.     As stated above, the SEC has shown by a preponderance of the evidence that Wesley Perkins and World Tree engaged in a cherry-picking scheme with scienter. Accordingly, they are liable for violating Section 17(a)(1) of the Securities Act, and judgment will be entered accordingly.

19.     To establish a violation of Section 206(1) of the Advisers Act, the SEC must prove each of the following by a preponderance of the evidence:

    a.  That the defendant was an investment adviser.

    b.  That the defendant directly or indirectly employed a device, scheme, or artifice to defraud any client or prospective client.

c. That the defendant engaged in that conduct acted knowingly or with severe recklessness.

20.    Section 206(2) of the Advisers Act is similar to, but broader than, Section 206(1). Section 206(2) imposes liability on an investment adviser who

a. Directly or indirectly engaged in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; and,

b.  Acted at least negligently in doing so.

*See Steadman*, 603 F.2d at 1134.

21.    During all relevant times, Wesley Perkins and World Tree were acting as investment advisers.

22.    Negligence is a failure to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances. Negligence represents a lesser degree of culpable intent than scienter.

23.    As stated above, the SEC has shown by a preponderance of the evidence that Wesley Perkins and World Tree engaged in a cherry-picking scheme with scienter. Accordingly, they are liable for violating Sections 206(1) and 206(2) of the Advisers Act, and judgment will be entered accordingly.

Misrepresentation of Allocation Practices

24.   The SEC alleged that Wesley Perkins and World Tree made false and misleading statements in their Forms ADV about the firm's allocation practices and thereby violated three statutes: Section 10(b) of the Exchange Act, along with associated Rule 10b-5(b), *15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b)*; Section 17(a)(2) of the Securities Act, *15 U.S.C. § 77q(a)(2)*; and Sections 206(1) and 206(2) of the Advisers Act, *15 U.S.C. §§ 80b-6(1), (2)*.

25.   The elements of a violation of Section 10(b) of the Exchange Act appear above; at issue here is the provision that imposes liability on a defendant who "made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Aaron*, 446 U.S. at 695.

26.   A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. The question of materiality is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor. *See TSC Indus v. Northway*, 426 U.S. 438, 449 (1976); *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 457 (2013) (quotation marks and citations omitted).

27.   Whether Wesley Perkins and World Tree allocated block trades fairly and equitably, as represented by their Forms ADV, or selectively cherry-picked block

trade allocations to favor certain clients over others, as was their actual practice, constitutes a material fact. A reasonable investor would likely consider such knowledge important in determining whether to do business with the Defendants.

28.     Because Wesley Perkins and World Tree engaged in a cherry-picking scheme with scienter, all while knowingly telling clients in their Forms ADV that they were allocating block trades fairly and equitably, their representations were untrue statements of material fact.

29.     Thus, the SEC has shown by a preponderance of the evidence that, by misrepresenting their allocation practices, Wesley Perkins and World Tree violated Section 10(b) of the Exchange Act and associated Rule 10b-5(b), and judgment will be entered accordingly.

30.     To establish a violation of Section 17(a)(2) of the Securities Act, the SEC must prove the following by a preponderance of the evidence:

        a.  That the defendant directly or indirectly obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

        b.  That the defendant's conduct was in connection with the offer or sale of a security.

c. That the defendant, while engaging in that conduct, acted at least negligently.

*See Aaron*, 446 U.S. at 695-96.

31.    For present purposes, Section 17(a)(2) of the Securities Act differs from Section 10(b) of the Exchange Act in that Section 17(a)(2) concerns only the offer or sale of securities, requires a lower showing of culpable intent (negligence instead of scienter), and adds the requirement that a defendant directly or indirectly obtain money or property by means of the misrepresentation.

32.    As discussed above, Wesley Perkins and World Tree knowingly misrepresented their allocation practices in connection with the offer or sale of securities.

33.    Wesley Perkins and World Tree obtained money by means of their untrue statements regarding their allocation practices because they received compensation in the form of advisory fees collected from World Tree's clients.

34.    Accordingly, the SEC has shown by a preponderance of the evidence that, by misrepresenting their allocation practices, Wesley Perkins and World Tree violated Section 17(a)(2) of the Securities Act, and judgment will be entered accordingly.

35.    The elements of a violation of Section 206(1) and/or Section 206(2) of the Advisers Act are recounted above.

36.    As discussed above, Wesley Perkins and World Tree were acting as

investment advisers when they knowingly misrepresented their allocation practices.

37.     As noted above, the practice of cherry-picking operates as a device to defraud. Wesley Perkins and World Tree intended to conceal their use of that device by misrepresenting their allocation practices. Thus, the misrepresentation itself represents an artifice or scheme to defraud clients or prospective clients.

38.     Accordingly, the SEC has shown by a preponderance of the evidence that, by misrepresenting their allocation practices, Wesley Perkins and World Tree are liable for violating Sections 206(1) and 206(2) of the Advisers Act, and judgment will be entered accordingly.

<u>Misrepresentation of Trading Practices</u>

39.     The SEC alleged that Wesley Perkins, Priscilla Perkins, and World Tree made false and misleading statements in their Forms ADV about whether they would trade in the same securities as their clients, statements that also violated Section 10(b) of the Exchange Act, along with associated Rule 10b-5(b), *15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b)*; and, Section 17(a)(2) of the Securities Act, *15 U.S.C. § 77q(a)(2)*.  The SEC further alleged that the false and misleading statements by Wesley Perkins and World Tree violated Sections 206(1) and 206(2) of the Advisers Act. The elements of the claimed violations are recounted above.

40.     Wesley Perkins, Priscilla Perkins, and World Tree's statements regarding their own trading practices in their Form ADV filings occurred in connection with

the purchase or sale of securities because the filings contained key information and disclosures about the firm which clients and potential clients could use to decide whether to obtain various investment and advisory services from the firm.

41.    Whether the Defendants did not trade in the same securities as their clients, as stated in their Forms ADV, or did engage in such transactions, as was their actual practice, constitutes a material fact. A reasonable investor would likely consider such knowledge important in determining whether to do business with the Defendants.

42.    Because Wesley Perkins, Priscilla Perkins, and World Tree knowingly represented to clients in their Forms ADV that they would not trade in the same securities as their clients while intentionally engaging in such transactions, their representations were untrue statements of material fact.

43.    Thus, the SEC has shown by a preponderance of the evidence that Wesley Perkins, Priscilla Perkins, and World Tree violated Section 10(b) of the Exchange Act and associated Rule 10b-5(b) by misrepresenting their trading practices. Judgment will be entered accordingly.

44.    Wesley Perkins and World Tree's misrepresentations regarding their trading practices were in connection with the offer or sale of securities as discussed above.

45.    Priscilla Perkins's misrepresentations were also in connection with the offer or sale of securities because her false statements regarding the firm's compliance

practices and safeguards constituted client solicitations that persuaded customers to engage in sales transactions with Wesley Perkins and World Tree. *See, Meadows*, 119 F.3d at 1225 (holding that investment solicitation is sufficient to make one a "seller" for purposes of Section 17(a) liability, noting that "[p]ersuasion can take many forms").

46.    Wesley Perkins, Priscilla Perkins, and World Tree obtained money by means of their untrue statements regarding their trading practices because they received compensation in the form of advisory fees collected from World Tree's clients.

47.    Accordingly, the SEC has shown by a preponderance of the evidence that by misrepresenting their trading practices, Wesley Perkins, Priscilla Perkins, and World Tree violated Section 17(a)(2) of the Securities Act, and judgment will be entered accordingly.

48.    As discussed above, Wesley Perkins and World Tree were acting as investment advisers when they knowingly misrepresented their trading practices.

49.    Section 206(1) of the Advisers Act proscribes only conduct employed to "defraud" clients or prospective clients. Black's Law Dictionary (11th ed. 2019) defines "defraud" as "to cause injury or loss to (a person or organization) by deceit; to trick (a person or organization) in order to get money."  Because the Defendants' trade practices represent a material fact (as noted above), Wesley Perkins and World Tree's misrepresentation of those practices caused an injury to current and

prospective clients, namely the loss of the opportunity to make an informed choice as to whether to entrust one's investment decisions to a non-neutral adviser. As noted above, their actions resulted in their financial gain in the form of advisory fees from clients, at least some of whom may not have done business with the Defendants absent their deception.

50.     As noted above, Section 206(2) of the Advisers Act is broader, imposing liability on conduct which operates as a fraud *or* deceit, and in which the investment adviser acted at least negligently.

51.     Accordingly, the SEC has shown by a preponderance of the evidence that Wesley Perkins and World Tree violated Sections 206(1) and 206(2) of the Advisers Act when they misrepresented their trading practices.

<u>Aiding and Abetting Advisors' Act Violations</u>

52.     The SEC alleged that Priscilla Perkins aided and abetted Wesley Perkins and World Tree when they violated the Advisers Act by misrepresenting their trading practices, as discussed above.

53.     Section 20(e) of the Exchange Act permits the SEC to bring an action against "any person that knowingly provides substantial assistance" to a primary violation of the securities laws. *15 U.S.C. § 78(t)(e)*.

54.     To establish aiding and abetting liability in this context, the SEC must prove by a preponderance of the evidence:

a.  A primary violation of the securities laws;

b.  That the aider and abettor had knowledge of this violation and of his or her role in furthering it; and

c.  That the aider and abettor knowingly provided substantial assistance in the commission of the primary violation.

*See Securities & Exch. Comm'n v. Life Partners Holding, Inc.*, 854 F.3d 765, 778 (5th Cir. 2017) (citing *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 621 (5th Cir. 1993)).

55.   As discussed above, Wesley Perkins and World Tree are liable for primary violations of the securities laws, namely Sections 206(1) and 206(2) of the Advisers Act.

56.   The misleading statements in World Tree's Forms ADV were made and controlled by Wesley Perkins and Priscilla Perkins. *Cf. Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142-43 (2011) ("The maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

57.   As chief compliance officer of World Tree, Priscilla Perkins's misrepresentations of the firm's trade practices are attributable to the company. *See Southland*, 365 F.3d at 384.

58.   As Priscilla Perkins's statements represent, at least in part, the basis of World

Tree's primary liability for violations of the Advisers Act, she cannot be liable for aiding and abetting that same primary violation. Put differently, she did not provide substantial assistance to World Tree's untrue statements; rather, she made them on World Tree's behalf.

59.   Similarly, Priscilla Perkins did not provide substantial assistance to Wesley Perkins's untrue statements regarding the firm's trade practices; rather, she directly joined him in making those statements. The mere fact that Wesley Perkins is subject to additional liability for those joint statements under Sections 206(1) and Sections 206(2) of the Advisers Act based on his status as an investment adviser does not prove that Priscilla Perkins knowingly provided substantial assistance to his untrue statements. In short, one party to a joint statement does not substantially assist the other party in making the same statement.

60.   Accordingly, the SEC has not shown that Priscilla Perkins aided and abetted Wesley Perkins and World Tree when they violated the Advisers Act.  Therefore, she is not liable under Section 20(e) of the Exchange Act, and judgment will be entered accordingly.

### III. Remedies

In light of the foregoing violations, the Court must consider appropriate remedies.

<u>Injunctions</u>

61.   As to Wesley Perkins and World Tree, the SEC sought permanent injunctions

ordering them to refrain from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 17(a) of the Securities Act, and Sections 206(1) and 206(2) of the Advisers Act.

62.    As to Priscilla Perkins, the SEC sought permanent injunctions ordering her to refrain from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, as well as Section 17(a)(2) of the Securities Act.

63.    Each of these statutes authorizes the entry of permanent injunctions when the evidence establishes a reasonable likelihood of a future violation of the securities laws by a particular defendant. *See 15 U.S.C. §§ 78u(d)(1); 77t(b); and 80b-9(d).*

64.    In deciding whether there is a reasonable likelihood of future violations, the Court considers the following factors:

      a.   The egregiousness of the defendant's conduct

      b.   The isolated or recurrent nature of the violation(s)

      c.   The degree of scienter involved

      d.   The presence and sincerity of the defendant's recognition of the transgression

      e.   The likelihood of the defendant's job providing opportunities for future violations.

*See Life Partners Holdings*, 854 F.3d at 784 (citing *SEC v. Zale Corp*, 650 F.2d 718, 720 (5th Cir. 1981)).

65.     As applied to the conduct of Wesley Perkins, all five of these factors suggest that there is a reasonable likelihood that he will engage in future violations:

   a.  His cherry-picking scheme and misrepresentation of allocation practices were particularly egregious and harmful to clients who trusted him with their investment decisions.

   b.  His conduct involved systematic practices over a three-year period.

   c.  He was fully aware of the wrongful and deceitful nature of his actions even as he was taking them.

   d.  He refused to acknowledge any wrongdoing.

   e.  He expressed his intention to work in the securities industry.

66.     Accordingly, pursuant to the applicable statutes and Fed. R. Civ. P. 65(d), the Court will issue a judgment permanently enjoining Wesley Perkins from violating 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 17(a) of the Securities Act, and Sections 206(1) and 206(2) of the Advisers Act.

67.     As discussed above, Wesley Perkins's actions, along with his scienter, are imputable to World Tree; thus, the first four prongs of the above reasonable likelihood analysis are equally applicable to World Tree.

68.     Accordingly, the Court will also permanently enjoin World Tree from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Section 17(a) of the Securities Act, and Sections 206(1) and 206(2) of the Advisers Act.

69.    As applied to the conduct of Priscilla Perkins, the results of the reasonable likelihood analysis are more mixed:

a.  Her misrepresentations of the firm's trading practices are not egregious. Though her untrue statements in the Forms ADV violated the law, they did not function to conceal inherently illegal conduct, as there is no outright prohibition on an investment adviser or firm trading in the same securities as their clients. While Priscilla Perkins's misrepresentation arguably facilitated the more serious cherry-picking violations of the other Defendants, the SEC did not prove that she knew of those more serious violations, let alone knowingly provided substantial assistance to them.

b.  Her misrepresentations occurred over a course of years; however, unlike the other Defendants, her violations did not involve highly frequent and/or daily decisions.

c.  She was fully aware of the wrongful and deceitful nature of her actions even as she was taking them.

d.  She refused to acknowledge any wrongdoing, though she did act to remove the misleading language when confronted.

e.  It is unclear whether Priscilla Perkins intends to work in the securities industry.

70.    Viewed together, these factors do not satisfy the Court that there is a reasonable likelihood that Priscilla Perkins will engage in future violations of the securities laws. Accordingly, the Court declines to grant the SEC's request for permanent injunctions against her.

Disgorgement

71.    The SEC asked the Court to impose joint and several liability against all three defendants for the disgorgement of their profits from the cherry-picking scheme, plus prejudgment interest. The SEC further stated its intent to return those funds to the LeBlancs.

72.    The Court has authority to order disgorgement in exercise of its traditional equitable powers pursuant to Section 21(d)(5) of the Exchange Act, *15 U.S.C. § 78u(d)(5)*, and to order prejudgment interest pursuant to 28 U.S.C. § 1961.

73.    The Supreme Court recently discussed limits on the power of a district court to order disgorgement in *Liu v. Sec. & Exch. Comm'n*. 140 S.Ct. 1936 (2020). Though the Court specifically authorized disgorgement orders that do not exceed a wrongdoer's net profits where the funds will be awarded to victims, its decision emphasized that such equitable awards could not function as a penalty. *Id.*, at 1949. The Court noted that joint and several liability awards were disfavored at common law and thus permitted only in circumstances where "partners engaged in concerted wrongdoing." *Id*.

74.     As discussed above, Wesley Perkins and World Tree engaged in concerted wrongdoing in the form of a cherry-picking scheme. Thus, the Court concludes that they should be jointly and severally liable to disgorge the wrongful profits of that scheme, plus prejudgment interest.

75.     As discussed above, the SEC did not establish that Priscilla Perkins participated in the cherry-picking scheme. Moreover, while joint and several liability may be appropriate for some married defendants, *see Liu*, 140 S.Ct. at 1949, Wesley Perkins and Priscilla Perkins did not marry until 2017, two years after the period of misconduct at issue here.  As no wrongful profits resulted directly from Priscilla Perkins's violations, she is not personally nor jointly and severally liable for disgorgement.

76.     The SEC established that Wesley Perkins and World Tree received gains of $347,947 as a result of their wrongful conduct. The applicable prejudgment interest on those gains is $36,335.98.

77.     Accordingly, the Court will issue a judgment holding Wesley Perkins and World Tree jointly and severally liable for the amount of $384,282.98.

Civil Penalties

78.     The SEC sought civil penalties against all three defendants pursuant to Section 21(d)(3) of the Exchange Act, *15 U.S.C. § 78(u)(d)(3)*, and Section 20(d) of the Securities Act, *15 U.S.C. § 77t(d)*.

79.     Under both statutes, courts assess penalties "in light of the facts and circumstances" and in accordance with a three-tiered system, with amounts adjusted for inflation. *Id.; see also, 17 C.F.R. § 201.1003*.

80.     The SEC asserted that the violations here warrant second-tier penalties because they "involved fraud, deceit, manipulation, or reckless disregard of a regulatory requirement." *15 U.S.C. §§ 78(u)(d)(3)(B)(ii); 77t(d)(2)(B)*.

81.     The maximum penalty for each second-tier violation is the greater of: $80,000 for natural persons and $400,000 for entities; or the gross amount of pecuniary gain to a defendant as a result of the violation. *Id.; see also, 17 C.F.R. § 201.1003*.

82.     The Court agrees with the SEC's tier analysis, and concludes that, for present purposes, the cherry-picking scheme represents one violation, while the misleading Forms ADV, taken together, represents a second violation.

83.     Accordingly, the Court will issue a judgment imposing a $160,000 civil penalty on Wesley Perkins, a $300,000 civil penalty on World Tree, and an $80,000 civil penalty on Priscilla Perkins.

A separate final judgment will follow.

        **THUS DONE AND SIGNED** in Lafayette, Louisiana, on this 15th day of January, 2021.

                                        _____
                                        MICHAEL J. JUNEAU
                                        UNITED STATES DISTRICT JUDGE